I appreciate the partnership and setting this up as a plus panel. The case this morning is 172473 Newville Pharmaceuticals v. Dr. Reddy. You all are split in time. So, you're first. We'll run the clock at your full time, which includes your rebuttal, and then you'll have to keep track of the dating date. Please proceed. Good morning. May it please the Court. Let me ask you a housekeeping question. Do you agree with the cross appellant's assertion in the red brief that if we accept their construction of essentially any, then the product would infringe? Your Honor, Mr. Pollack was set to talk about the cross appeal issues in this case. Okay. Okay. Go ahead. There are three unchallenged factual findings in this case that highlight the district court's error in analyzing written description of the effective use of an uncoded PPI. First, the district court found that the specifications of the patents provided no information regarding the effective use of an uncoded PPI. Second, the court found that the missing efficacy information was not inherent in the disclosed formulations. And third, in holding the claims non-obvious, the district court found that skilled artisans would not have thought that uncoded PPIs would work as presided in the claims. Okay. You know, we've had not a huge number, but we've had some number of cases for written description and there's some confusion in terms of the overlap. But in a recent case, Judge Lurie wrote in the Alcon case, which seems to sort of parallel this, because the claim talked about PECO would enhance the chemical stability. So there's some result claimed. And he concludes, no, the written description is not active. It's about whether, he doesn't say that, but it says it's about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described. It is not about whether the patentee has proven to the skilled reader that the invention works or how to make it work, which is an enablement issue. Why doesn't that speak to the fact that, at best, this is an enablement question? When we're talking about whether it works, whether it's therapeutically effective, that's the result. That's how it works. That feels like enablement, not written description. Right. And I think there is, I think as Your Honor alluded to, there may be some confusion between referring to enablement and referring to written description in situations like this. And I think part of that stems from the fact that a lot of the enablement cases, like the one you're referring to, like the Rasmussen case, the enablement issue is framed in terms of utility. And in a case like this, where the functional language in the claims actually speaks to effectiveness, if you're talking about whether the claims work, it might sound like both the utility requirement is brought in. Well, why is whether PECL would enhance the chemical stability, why is that not enhancement? Why is that not improvement in the enhancement and not just utility? Well, I think it was utility, and I think it's also a limitation in the claims that has to be described by the specification under the written description requirement. So in this case, we have these efficacy limitations. They are affirmative limitations in the claims, and they happen to point to efficacy as the function. So it's not, you know, it does some binding activity. It's actually efficacy. So it sounds like utility in a lot of ways. Right. But it is a claim limitation that's recited in these claims that has to be described. And in this case… Well, how would you describe it? Give us an example. I think you've recognized that our cases speak to the fact that you don't need all this experimental data in the written description. So give me a few examples of how one would adequately describe this therapeutic, whatever its language is. Sure. So a lot of the cases talk about experimental data. I think that's pretty clearly enough in most cases. But not required. Not required. No. The cases have said that's not an absolute requirement. It is a factual question. And there is some spectrum between having, you know, conclusive experimental data and having no information. And there is some line that can be drawn in between there where it's enough or it's not enough. And that's going to depend on the context of the case. I don't think you have to draw that line in this case because what we have here is no information. What about a theory? Excuse me, Aaron? What about a theory? I think… Some type of a theory as to why uncoded DPI would be therapeutically effective. Yeah, I think that's something that a fact finder could find suffices in certain cases as we referenced in the briefs. That's not there in this case. How would that theory look like? Something like the fact that if you release a little bit of uncoded PPI along with your NSAID, your NSAID is protected in the course of the fact that you haven't released enough PPI to have it totally degraded, right? Yeah. The theory would somehow address the fact that they recognize that uncoded PPI in the words of the patent can be destroyed? I think that's right. I think that could be something that the inventor could have put in the specification. I think that actually… Well, we need that. I mean, we've had a number of cases where they don't look to exactly the language in the specification, but they rely on a person's skills in the art of testimony is how he would have understood the invention. So, I think there's not that much in the district court opinion about that, but I think there are some references. This, of course, we all know is a question of fact, and there are some references to whether or not that a person's skills in the art would have understood that they have this. Isn't that sufficient without actual language in the written description? Well, I think there are some cases that have found that. Again, in this case, we have affirmative findings by the district court that there's no information in the specification about this invention. This effectiveness was not inherent in the formulation, so you can't compute it that way. And we have affirmative findings that the person's skills in the art would not have thought this was going to work. Well, except there is – this is at appendix page 80 of her opinion, and it's kind of confusing because it's not in the written – I don't think it's in the written description portion. I think it's more when she's talking about enablement. Correct. Which is why I didn't see it. But in any event, she does make a finding that says sort of in the middle of the page, appendix 80, testimony from both sides of trial indicated that a placebo at the time of the invention would have accepted that a combination of an NSAID and a PPI would be effective for treating pain and conditions like arthritis. Does that go to whether or not it's therapeutically effective? Or is this something else? Or is your argument that the site – we can quibble or we can just debate whether or not the site she gives for that will do what she says they do? But in any event, what's your reaction to that? So I would argue that this is something different entirely. I think this goes to utility. And so what the court is talking about here is the effectiveness for treating pain and conditions like arthritis, so pain and inflammation. That's what the anti-inflammatory does. That was prior art, well-known in the art, that if you give an anti-inflammatory in a formulation like this, that is going to treat pain. Was this Kibbe's testimony she's talking about? I would have to double-check on that, Your Honor. I'm not sure which expert this is. But I can get that for you. Kibbe was our expert. So this reference to pain doesn't have anything to do with the PPI. And I think this gets to the utility issue where somebody would know that this formulation, even if you don't think the PPI is going to work, it's going to have some level of utility because it still will treat pain and inflammation. Okay, so then let's get to, do we agree that her analysis of written description is like on 81 to 83? Yes, and I see my light's gone red, Your Honor. Let me point that out. So this is written description, 81 through 83. Correct. She says, as the defendant points out, a certain patent do not address the efficacy of uncoated PPI through experimental testing or other statements in the specification. The conclusion seems to be at 83. In light of disclosures in the specification describing the immediate release of an uncoated PPI and the potential disadvantages of enteric-coated PPI formulations, we conclude the defendant has not shown this. Can you explain to me what she was referring to there? Yes. So she's saying you haven't shown that it should be invalidated for failure of written description. On 83 is what you're looking at now, correct? Yes. Yeah, so the way I read this is that she's saying, I find that there's sufficient written description in light of disclosures that there could be immediate release of a PPI. That's clear. I mean, that's example six. Yeah, and that's in the prior art. I understand that. But what we're trying to focus in on now is exactly what was the district court's rationale for saying there was sufficient written description. Right. Having already said, I can't find anything in the spec about uncoated PPI being therapeutically effective. I basically find that it will be destroyed. So she says that. And then she says the potential disadvantage is an enteric-coated PPI, which presumably, I think what she means is the fact that it is slow to release. I think that's right. That's in column three or two, isn't it? So those are the two data points. Right. So those are the two. The only two data points she refers to are those, the immediate release and some reference to a disadvantage, perceived disadvantage in delay from enteric-coating. Notably, she does not address the efficacy limitations, which are also recited in the claims. I think she skipped over that part and said that doesn't require us to find otherwise, but there's no explanation there. There's no attempt to reconcile the findings on the preceding two pages where she says the specification has no information about that aspect of the claims. Well, right. That's your finding, but it has no explanation. Right. Perhaps from the other side. Right. Our position is that the specification required something to provide, to show possession of that part of the claims, which is not there. Why? Is that because under her obvious miscalculation, we all conclude, or she concluded that there was skepticism about whether or not this would work? I mean, and we don't have very many cases that sort of combine the obvious analysis with a written description. So do you need that? Is that part of your – or do you just need someone skilled in the art to say something? Well, I think it informs the analysis, because the whole question is taken from the perspective of the person of skill in the art. So what we have here is a specification that tells that person nothing about this. Doesn't a lot of law and skill in the art world think independent of the specification is irrelevant? Doesn't it? Doesn't there have to be a hook in the specification? Has to be something in the specification that law and ordinary skill in the art can point to and say, see that? That's what teaches me that the inventor possessed the concept that uncoded PPI can be therapeutically effective, even though everybody knows that it can degrade when it's uncoded. Yeah, I think that's exactly right, Your Honor, and I think the reference to the – The question in our case is simply to take the specification and take my magic marker and my red pen and try to find something in the specification that is teaching the possession of therapeutic effectiveness of uncoded PPI. And the district court made that finding for us and said there is nothing. No, it's a finding, but I mean, that's reading the document. I can do that independently. That's not a fact finding, right? I think that is a finding of fact, whether or not there's a disclosure in the specification. And I think the district court made that finding for us, and I don't think it's been challenged here. So that's a fact question reviewed here for clear error? It would be, yes. And the district court's finding is that there is in this appendix 81 and 82 that there is – Where do you see that? 182? So if you look at appendix 81, it's the passage that Chief Judge Crowse was pointing to earlier where the judge says, as defendants point out, the assertive patents do not address the efficacy of uncoded PPIs through experimental testing data or other statements in the specification. So there's no data. There's not any other statement either. And there's a similar statement on appendix 82 where the district court says – So does this case simply turn on evidentiary questions? If she's correct, then there's no hit. That's right. I don't really care what one's doing here. Right. That's one way to look at the case, certainly. And who's trying to – the other side has to disprove that fact finding? Well, I think – I mean, we're here on appeal. If they want to rely on something – I'm just trying to get my hands around it. Right. You're here on appeal. You like that fact finding. You're supporting it. If the fact finding is accurate and correct, then it would seem to me that it's a real problem for the other side. I think that's right. I think it's tough to reconcile the district court's judgment on this issue with that finding that's in the record. Can I take you back to where I started, at least, which was where we draw the line between enablement issues? Because you had an enablement issue down here you just didn't appeal with. Correct. Why – and you mentioned when I quoted what Judge Lurie said, which was out of Ariadne, you said, well, utility is an enablement question. But it's whether – isn't the question whether the invention works for its intended purpose? And is it part of its intended purpose to be therapeutically effective? So why doesn't this fall foursquare under the analysis of enablement and not within the district? So enablement has been framed in a couple of ways, I think. There's the – enough disclosure to teach somebody a skill to merit to make and use the invention. In this case – That's intended purpose, right? That's inherent in that. Or for a useful purpose. I think that's where the utility issue comes in. So it's also been framed in terms of utility. And in this case, we have – what is – I think everyone agrees it's a fairly straightforward, simple pill structure that's disclosed in the specification. And I – the district court found that it wasn't really disputed that somebody skilled in there would know how to make and use that pill based on, you know, what's in the figures in the specification. Somebody could make that. And it would – even if it wasn't disclosed as having the – there was no basis to find that it was effective for the uncoated TPI effectiveness limitations, somebody skilled in there would still look at that and say, well, I know there's this anti-inflammatory in there. I know what that does. We normally give that with enteric coatings. That's how it's presented here. So it is going to treat pain and inflammation. So it's going to have this utility – one of the utilities that's talked about in the specification. It's the other one that's in the claims and it's not in the specification. That's the problem. Okay. I'm going to go to your other slide. This is the problem of splitting time. Because your time is really our time, and our time is what we have questions on. So I know Jeff Wall has at least one question for you all. Thank you very much. Thank you. So here we talk about two different issues. First of all, if you'll excuse the court, my name is Alan Pollack. I'm here from the Budweiser Law Firm, and I'm going to discuss first why the 285 patent claims lack written description for an additional reason beyond what we've just heard. As we move from the written description arguments – I'm so sorry that your co-counsel used up all your time. Will you answer my question I asked him? I certainly will. Although my understanding is that pertains to the cross-appeal. I was supposed to allow Horizon to speak first on that, but the answer is yes. Okay, fine. Can you repeat what the question was? Do you agree you lose if we accept their construction of essentially any? Right. That's the claim term in the 907 patent, which is part of the cross-appeal, which I thought they were going to speak to first, but I can take it in whatever order the court would like. Go ahead. You took it. I don't know if you have more to say about that. I have plenty to say about the cross-appeal, Your Honor. That, of course, is something Horizon is appealing. We won summary judgments on that issue before the district court, and I think that issue should be very straightforward because – I'm sorry. Why don't we wait until we hear from them? Certainly. Okay, so what else are you here to talk about? I'm here to talk about why the 285 patent is invalid for lack of written description for a different reason than we've just heard about, and this argument is specific to the 285 patent only, and it also has to do with a different aspect. The previous discussion we just heard had to do with the uncoded PPI. The discussion I'm going to offer has to do with the uncoded naproxen, the uncoded NSAID, the other component of the two active ingredient component tablet that we're talking about. The 285 patent is a follow-on patent. It spun off the 907 patent by two divisionals and a continuation in part. It issued two years after this case began and eight years after the 907 patent issued. The point of the patent is preventing NSAID release, unsafe NSAID release. There is no other point. The patent presents only one way to do this, as explained by the inventor or trial. The whole point of the idea here is to get acid inhibition before the administration of the NSAID. There is no dispute that the 285 patent claims cover tablets that do not do this. They cover tablets that release large amounts of naproxen before any acid inhibition. The whole point of the idea here is undermined by releasing a large amount of NSAID first. There's so many issues in this case. Is this the one where we get into the word comprising? Yes. The uncoded NSAID gets in via the comprising clause. Yes. And the district court resolved your challenge here by saying not to worry, not to worry. The notion that you would have coded naproxen is simply a preferred embodiment. That's exactly right. And because it's a preferred embodiment, other embodiments, i.e. those that would enable even an unlimited amount of uncoded naproxen, they are not preferred embodiments. You only need to describe the preferred embodiment. Right. That's exactly correct. And so on the decision tree, if she's right, if the district court was correct, that it's only a preferred embodiment as opposed to the inherent nature, then you lose. Because the law only requires you to describe the preferred embodiment. I think the conclusion might be… How do I decide? Is this a claim construction issue? It is not a claim construction issue. The 285 patent was construed, actually, at the trial. I understand it's not a claim construction. But you're telling me that the district court was wrong because the invention is drawn solely to this coordinated release. And a coordinated release disallows any uncoded naproxen. That's correct, Your Honor. And I think the reason why… Why aren't you raising a claim construction issue up here? How do I go about undoing what you did? How could a specification cover all potential features not required but merely allowed based upon the use of comprising? I think the answer to that question is that this specification is about one way to do something, and that way is to control unsafe and safe release. That's the point of the patent. There's really no other point. The issue that I think allows us to talk about this as an unclaimed limitation is that we do not say that there's a requirement to disclaim or to negatively claim any possible feature that could be a problem for the invention. That's the analysis that Horizon suggests. But that's not the case at all here, and I can give you a specific example why that is. It is not our position that the written description requirements require, say, a negative limitation for arsenic. I think we can all agree that if you included arsenic in this tablet, that would be a bad thing. But we do not argue that written description is transgressed or not satisfied because there's no affirmative… no claim element saying don't put arsenic in this tablet because this invention has nothing to do with arsenic, but it has everything to do with preventing unsafe NSAID release. That's the whole point here. And if you have claims that sweep in… So you're saying the patent does allow a certain amount of uncoated NSAID. I think that there's… certainly if we look at the 907, the NSAID coding term… I mean, haven't you walked right into her preferred embodiment? No, I don't think that's correct. I think that whether… Well, why isn't an embodiment that has a little bit of uncoated NSAID just another embodiment? First of all, there's no description in the specification of that. I understand that, but my point is that it isn't required. I think that… Her analysis is that if you have an invention that has several embodiments, one embodiment is that there's no NSAID at all in the formulation. The other one is there's a little bit. And you wouldn't argue that an entirely uncoated NSAID would be within the embrace of the invention, right? Two responses to that. I agree that some small amount, a minimal amount of NSAID release is… That's what we're talking about. We're not talking about an absolutely entirely uncoated NSAID. I think the invention can tolerate a small, minimal amount of NSAID release, but there's no disclosure in the specification at all about that at all. I understand that, but I mean, if that is yet another embodiment and not the preferred embodiment, then the law, I think, wouldn't require a description of the lesser embodiment. Well, I don't agree that it's an embodiment at all. There's no suggestion in the specification that the invention can tolerate… Well, it becomes an embodiment by virtue of the enticing clause. Doesn't it? As the claim was construed, it allows unlimited amounts of uncoated NSAID. I understand she did that. Right. So I don't know… It doesn't seem to square with what you think the invention is or anybody else. That's correct. That's the basis of our written description decision. But I don't think whether coordinated release as a concept can tolerate a small amount of NSAID release doesn't really address… You're not asking her. You're not saying that the patent has to describe absolutely totally uncoated NSAID. Well, I'm saying… She says there's no limit on the amount of uncoated NSAID that could be in here. That's right. It could be entirely uncoated, which makes you wonder what she's talking about. That's the effect of the comprising clause. Right. But I think… She didn't choose to draw a limit on the amount of uncoated NSAID looking at what the invention is all about and looking about this coordinated release and the rest, right? Yes, that's correct. But I think… What do we do? I think you have to find that there's no written description here because of the breadth of the claim. No written description of what? For the 285 patent claims because… Exactly what? No written description of a little bit… No, no written description of tablets that release a substantial amount of NSAID below pH 3.15. And these claims clearly read on that. That's clearly not the invention. If you look at the picture, that's on page 53 of the yellow brief. It's an example of a tablet that fits that description. It claims to read on something that's not the invention. Excuse me? It claims to read on something that's not the invention and you have a requirement to describe what's not the invention. Well, I think… That's just what you said. Well, no, but you're saying she's wrong because she concluded that the claims read on that. No, I think the error that the district court made is that it made a sharp distinction between limitations that were required and permitted. That seemed to be a very important point for the district court, which I think the district court got wrong. I think the district court's interpretation was that any element of a claim that's not required but permitted does not need written description at all. And I think that's why she made the findings that she did. Yeah, but that brings us back to your earlier hypothetical, which you recognized would put us all in a ridiculous situation… Sure. …which is the same would apply to comprising, and it doesn't include arsenic. Right. So anything at some later date in arrangement analysis where you're saying the fact that it has this additional thing doesn't take it out because it's got that comprising line… Mm-hmm. …the patent owner would have had to describe that in the invention 15 years earlier when he was drafting the claim. It's kind of hard to see how that would work. Well, I think… We're requiring, under your analysis, anything that falls within the comprising that isn't precisely the claim still has to have a written description. Anything that's a central part of the invention. Here, as I mentioned, the only point this has… Well, it's hard to think that something that's not being referred to in the claims that comes under the comprising language is a central part of the invention. That's just hard to… Well, for this particular patent, I don't think it should be that difficult given that it doesn't have any purpose other than preventing unsafe NSAID release. That's the only disclosure this patent specification has. So it seems to me, going back to where Judge Clevenger started, it just seems to me an issue that should have been sussed out during claim construction. Well… What you are saying, this should not be uncoded NSAID. This should not come under the claim here because the claim is directed towards exactly something else. And maybe proof of that is that there's – we're not talking about written description. When we do a Phillips analysis, we look at what the spec says. So that would have been an argument to be resolved at claim construction. Maybe it would have lost and had to appeal it here, but this seems like we're talking about a claim construction. Well, I would disagree, Your Honor, respectfully. I think that that's a stretch too far. If you look at the words of this claim, I'm not quite sure how… What's a stretch? What I'm saying or what she said? No, that this is a claim construction issue. Okay. The reason for that is if you look at the words of this claim, I'm not quite sure of which words you'd actually have to change or what modifications you'd have to be. I understand this court has a… No. Suspende. This court can redo claim construction, but I think we can't just take the words of the claim and make them anything else. What you would really have to do to have this patent track the specification as it should have done is make these claims like the 907 claims. You'd have to add in something like the end said coding term from the 907, which is the source of the question that Judge Wallach raised a while back. I don't know that… As I said, I think that's a stretch too far. Are you going to suggest that it has no release at all? In other words, impute the word it when it says inhibits the release, inhibits its release, it meaning the surrounded end set or the end set in the core. Are you going to suggest that there's absolutely none of that? Are you going to put in the word essentially? What exactly is the change that would be proposed? As I said, I think that's forcing the words to take on meaning too different from what they clearly are. That's not the regimen that was conducted in the seven different written description cases that we've provided. That issue could also apply to the ICU medical case. That was the case with the spike valves. The same question could be raised there. Why wasn't instead of… Excuse me. That was a case before this court where claims were invalidated on written description grounds because the claims were written in the absence of any type of a limitation that discussed spikes. Apparently, the specification in that case talked about valves with spikes, and this court decided that those claims were improper because they didn't have at least the so-called spike-less claims lacked written description. They didn't write in a spike to those claims, and we have six other cases exactly like that. Time's up. We'll reserve some of that. Thank you. Thank you. Good morning, and may it please the court. I'd like to just quickly respond to some of the comments that were made by my colleague. What issue? Are we talking now about PPI or about an approximate? Well, I'll start with PPI, then I'll talk about an approximate, but I would like to first start with the concept of written description and what's required, and I do believe the Alcon case, the court noted, is controlling on this case in the sense of you must look at whether the patent discloses that the inventor was in possession of the claimed invention was actually… Okay, let me ask you about that. If you take the claim language, and it's sort of like what we were required to do all the time in statutory construction. We need to give every word meaning. How would the written… Do you say this written description describes the claim if you ignore the… We can all agree, if you ignore the words therapeutically effective. So what more beyond… Wouldn't the written description map on exactly to the way the claims are written in the absence of therapeutically effective? So therefore, it strikes me that even under a rubric of statutory construction, we need to give meaning to those words, which I'm sure you do by putting them in the claim. So the question is, for every claim limitation, we need a written description. What is there in the written description that deals with the addition of those words, leaving aside everything? There's no dispute, everything else in the claim language is covered by the written description. So where do we get the description for those three words instead? Well, I think with respect to the uncoded PPI and the therapeutically effective amount, if you look to, and I'm referring to A-206… Are we talking about the 285? 285 patent specification. Give us a column and line. There's a description about what the therapeutic effective amounts are for purposes of this claimed invention. It tells the reader… Those amounts are also in the claim. Correct. Okay, so going back to my question, everything in the claim, this is support for a different claim limitation. How is this support for something other than the claim limitation? Well, it's disclosing that there should be a therapeutic amount of the PPI. What are you saying, proton pump inhibitors? Read me the sentence. Or it should be present in an amount… It doesn't say anything about therapeutically effective. It would typically be present at about 5 to 6 milligrams. What column are you in? Column 8, line 5 or 6. Line 5 and 6? Yeah. Okay. And that's telling the skilled artisan this is what you should use in the claimed invention. Yeah, but that's what all the claims… Again, going back to my premise of you're reading all the claims. If you chose the word therapeutically effective from the claim language, this would still make perfect sense. This is still going to the claim that is a limitation other than the one I'm talking about. Right. So do you understand my question? Yeah, and I think there are two other parts of the specification that address that issue. First, if you look at, and I'll go back now to column 2, which is a… Coming into this conversation, you are disagreeing with the district court's findings that there's nothing in the spec that deals with efficacy of uncoded PPI. I'm agreeing with the district court that there's no experimental data about efficacy. No, no, no, no, no, no, no, no, no. There's no data or other evidence in this fact. In the specification about the efficacy of the uncoded PPI. Yes, yes. But efficacy is not specifically discussed. However, she also mentioned… Just take it easy. I think what we know by way of background is that uncoded PPI, and I think in the words of Patton, can be destroyed in the stomach. And we know that at least some people in the fire department thought that you wouldn't use uncoded PPI for that very reason. Because if it's going to be destroyed, it's not going to have… If it's destroyed, it can't have any therapeutic effect. Right? If it gets destroyed in the stomach before it has a chance to deal with pH, okay, so you have that problem. So you say to yourself, okay, where is there something in this patent that teaches me that the uncoded PPI will not be destructive? It will have a therapeutic positive effect. So what I want you to do is to start with column one or whatever. I've got my red pen out. And just point to the language other than the recitation of the claim language. Because in Ipsos-Ferbus, just recitation of the claim language is not enough. Well, I'd first point to A203, at the appendix A203 of the 285 patent. Right. The skilled artisan walks through the background of some of what you just described. Column and line. Starting at column one, line 48, the inventor provides background about longer-acting acid inhibitors, lasting acid inhibitors, such as proton inhibitors, and then walks through to column two, line 11, the downsides of those longer-acting coded proton pump inhibitors. And specifically, I direct you to column two at line four through seven, which the district court included in her opinion at page 64 of the opinion at appendix A203. Right. She says that the disadvantages are part of why she thinks she would use uncoded PPI. Right. And that the inventor says to the public, yes, the prior art thought you needed to code them. I believe you shouldn't code them because that results in deleterious effects. And I want to – then the inventor goes on to say in the summary of the invention at column three, starting around line 16, that I want to actively raise the intragast pH to levels associated with less risk. That the inventor is saying, I'm doing something different from the prior art. I want to actively raise and have – and then the patent goes on, as she noted, and repeatedly talks about making that uncoded PPI immediately released. And the inventor is telling the public that that's going to work. Notwithstanding what people might have thought in the prior art, that is going to work. That is an invention. Tell me, I'm looking for that. Where is he telling them that is going to work? And in that same column, he's saying that you will be reducing the risk of GI fibromyalgia. Why? At column three, starting at line 11, the present invention is based on the discovery of a new method for reducing the risk. That method involves a coordinated pharmaceutical composition that combines an agent that actively raises intragastic pH. And by that meaning, as further described in the patent, immediate release. She pointed – the district court judge pointed to that specific discussion earlier in column two about the downside of coding. And she referred to this section. She didn't refer to this. Correct. And you're saying she referred to the stuff in claim two, but that was in connection with column two. No, in column two. Column two, the downside. That was the obvious analysis where she found this was not obvious because there was skepticism in the field. The district court pointed to that in the written description discussion at appendix 83, page 64. Is there anything else in the specification that talks to the therapeutic effectiveness of uncoded PPI, especially in the fact that we know that it's uncoded, it can be destroyed? The specification does not discuss the destruction of uncoded PPI. The specification tells the scale artisan that the PPI will function in the claimed invention. Okay. Before you went to Judge Kley's discussion, you were referring up to – and the district court said that at appendix 83. So point to me where you're – in light of the disclosure describing the immediate release and the potential disadvantages. That refers to what comes in that prior paragraph above where the district court points out the specification's teaching that immediate release is explicitly distinguished from the interic coded formulations that delay the absorption. That the inventor is intending to create a situation in which the PPI is immediately released and will have an impact. The column two says that the reason why you post this is to avoid destruction of the PPI by the stomach acid. That that was an issue that had been identified in the prior part. I'm just saying that we have to live with that fact is that that's a risk that you use if you have uncoded PPI. So the patent teaches that uncoded PPI can become therapeutic and ineffective by its destruction. The patent teaches that the prior art believed that the PPI would be destroyed if it was not interic coded. The inventor said that's not correct. I want to use an uncoded PPI because that will actively raise the pH. But how does he know it doesn't get destroyed? That's where we – that was the inventor's belief based on his knowledge and his experience. That was the essence of the invention is that he believed it would work. And in fact, it did work. I mean – Well, the court rejected you in the same paragraph you were just referring to. She rejected your inherency argument, right? You came forward with an inherency argument. Can we look at the appendix and some of the testimony at least with respect to – I don't know if I can find it immediately. Okay. One of the things – but this was in the enablement thing, so I'm a little confused. But it seems that that sentence helps you when she talks about in the earlier – she's talking about enablement. It's not in the description. But she does say testimony to both sides indicated that a placenta would have accepted the combination would be effective for treating pain and conditions like arthritis. Now, do you agree with Judge Klobinger's commentary on that, that that's not what we're talking about, the therapeutically effective stuff we're talking about now? Well – That that doesn't help you? I think it does help in the sense that you do have to look to the four corners of the specification as to what it tells when it's built in the art. And this is evident. She's not citing the specification here, is she? She's just – she's relying on the – Testimony of experts who are saying what the specification – Well, why don't we look at what they're saying? Because we're – again, on the point of treating pain and conditions like arthritis, do you agree with Judge Klobinger that that's not kind of the therapeutically effective stuff we're looking for here in the claim limitation of the issue? Well, the – no. You are looking at the claimed combination, and the claimed combination of A plus B is intended to reduce the GI side effects of naproxen. So you do look – But the question is whether the uncoded PPI contributes to that, right? Correct. So, I mean – And the testimony by the experts is that one skilled looking at this patent specification wouldn't believe that the uncoded PPI would function as described and help protect the – Where is that? Who says exactly that? It was – Dr. Williams testified, and I'll get the – And the testimony that she cited, the question – the answer to the question was it would be effective for treating chronic pain. I think I have got that right. I'm not sure. I don't know what he means by that. I mean, it's – and when she – when her citation is to line four, which leaves out his last comment, which is I'm not sure. So I don't know whether she thought that was irrelevant or whatever. What do you make of that? If he concludes by saying I'm not sure and she didn't rely on that. She relied on his first sentence. It's a little hard to know what to do with that, right? Well, with respect to that specific testimony, it is correct that he – those are his words. But the issue came down to what did he interpret the specification as teaching and let the inventor in possession of what was taught. And I think, again, that goes back to the analysis and outcome. You have to look at what the specification teaches the skilled artisan, and you don't have to guarantee – there's no requirement under the law that you prove – Well, I'm looking for testimony. I don't know if it's enough, but I certainly think it would be helpful to your side if we had testimony for a patina that the district court relied on that said, reading the specification, I am satisfied that the inventor had possession not just of this thing but that this thing would be therapeutically effective. So can you – I don't see it as her opinion. So do you have some expert testimony that, looking at the specification, says this is – I understand – you know what I'm looking for. Where is it? Right. I don't have something specific to identify in the testimony of the experts that she – Well, show me something that comes close. What's your best site from the expert testimony that gets us even close to that kind of analysis of the specification? But that's what – I mean, I don't know if it's outcome. There's another case where, yeah, the district court relied on the testimony of the experts, and it's hard to dislodge that on that question of view. But I'm looking for it in the record here. I don't have a site for that yet. Okay. I'm not sure, but I'm guessing that the district court took that, I'm not sure, as referring to the deposition testimony not to vote. That may be right, but I remain that that testimony, even if you take – I'm not sure – out of it, whether that gets you to where you need to go. All right. I'm hoping my colleagues may have questions, but beyond that, you might want to get to your cross-appeal at some point. Correct. I'd like to mention quickly on the unput in the proxem issue. I just wanted to mention that we do believe that – I just want to come back, circling around, because I'm – maybe I'm too a bean-catter or too narrow-minded here. But my understanding of the law of written description is that you could have all the testimony in the world about what one of our years still in the art thinks about the patent. But in order to satisfy written description, you have to point to something I call the hook. You have to point to something in the specification that the person of ordinary skill in the art can say, see, whoops. And the way I'm understanding – and we think we know that the recitation of the claim language in the specification doesn't suffice alone. So I was understanding you to say that basically the language that you pointed to in column three, line 11 down to 35, is your best shot for the hook. The background of the invention – we know what the background is, but the background also includes the fact that if you use uncoded PPI, you run a high risk of destroying its efficacy. But I also think, one, you can't – as the district court did, you can look at the disclosure of column two, which is in the background of the invention section, but in which the inventor points out the problem and that the inventor believes – of inter-encoded and believes that you should not inter-encode. It's probably – it's genius. It's looking both ways. There's a problem if you have – if you coat your naproxen with cement. It'll never do anything. The problem that she's talking about, as I understand it, in column one to column two is that depending on what kind of coating you're using and depending on how various bodies work, the ability of the body to wear off the coating is problematic. It's problematic. Not that you wouldn't use coating. It's problematic. She points to that, and I understand that. At the same time, we have to have in mind the fact that, you know, you better be careful that you don't peel enough off to destroy the stuff, right? So there's that tension, and I think it was that tension that leads to the part of the testimony from those of ordinary skill in the art that say, well, nobody would – this wouldn't be something to do. That's why you prevail on 103. And so in my mind, we're looking for something hooked in the spec that shows that the patentee got it in terms of knowing that you better be careful not to use an entirely uncoated API to get destroyed. And so that's what I'm looking for. It seemed to me like when you come to that, the language that you pointed to in column three is your best shot. I don't see anything else. And I'm taking the example six and throwing it aside as simply a recitation of what's in the claim. And I do believe – well, and I do believe example six was a recitation of what is in the claim and what we're looking at is what was in – whether the inventor was in possession of what was claimed. And you have A and B. You have the two components. And in response – And this is a situation where sort of walking in, sort of say, well, this is somebody just walking up to it. When whoever wrote these claims knew that there's – if you claim therapeutic effectiveness, you have to disclose it. And you have to describe it. Okay. And they knew that. And he knows that there's standard ways of doing it are with tests or with a theory of some sort. That is, that can be divine from the specification, not from the failure or inherency. So he knew what the rules were. And the inventor – our position is the inventor accomplished that goal. The inventor said this is what was known in the prior art where you would enter a code. I'm saying from my invention, my inventiveness is to use an uncoded PPI even though you didn't believe it would work. You think that constitutes a theory. I believe that constitutes a theory. And I believe that's what she – the district court believed also through that specification. She didn't rely on that. Didn't we already go through that she wasn't – she never referenced that portion of the specification. Not of column three, but of column two where the inventor pointed out that the problem was the prior art. And to your earlier comment, question, my colleague shared with me the testimony of Dr. Kibbe. This is appendix 10397 where Dr. Kibbe is looking at claim one. It says there should be a therapeutic effective amount. Wait, wait, wait, wait. Let me just get the page. Okay, I got it. 10397. And Dr. Kibbe notes that the defendant claims lay out the range. Buried on 10397. At line 22. And Dr. Kibbe is looking at the claims of the 285 patents and is saying that the range that is in the claims is supported by the literature to give you a range that would be therapeutically effective. So Dr. Kibbe is saying that that range that's recited in the claims and in the specification would be – which relates to an uncoded PPI would be therapeutically effective. Yeah, but he's looking – Yeah, we know that amount is claimed. He's answering. They're not looking at the specification as far as I can tell the context here. They're just reading what the claims say. And it's just extra testimony that would be therapeutically effective. No, the sentence at the beginning, claim one says. So he's talking about what claim one says. Right? And he says then the defendant claims lay out a range, which is supported by the literature. And then the defendant claims. Did anybody ask him if he agrees with what it says? Okay. Can I take you back to a little debate I had with your friend on the other side, which is just trying to get us around the line drawing between written description and enablement. And particularly, we were talking about this paragraph in the outcome case. So do you agree – as I understood, that the inventory works. That's the enablement thing. That's the utility requirement. But where does – that it works is one thing. It's operable. But that it works for the intended purpose of being therapeutically effective, I guess the question before us is does that extra part also need a written description or is that purely an enablement analysis? So can you help me on that, please? I think our position is that is primarily an enablement analysis. But even in Alcon, the district court in discussing written description. Primarily. Well, because the facts go to both issues, enablement and written description. So where does the fact of whether or not it works for its intended purpose, which in this case the claims say is to be therapeutically effective, where does that little subgroup belong? Under written description or under enablement? It belongs under enablement, not under written description. Alcon held that written description is about whether the skilled reader of the patent disclosure can recognize what was claimed corresponds to what I described, not about whether the patentee has proven to the skilled artisan that the envision works or how to make it work. So written description is not about proving that it's therapeutically effective in your specification. No therapeutic effective claim ever has to be described in terms of its therapeutic effectiveness. That's a broad question. You've written, you've taken, you just took the requirement for written description of therapeutic effective out of the law. You've taken it away. I don't believe that's what the Alcon decision was intended to do. And if Alcon says that, it's wrong. If you're looking at a claimed composition, a claimed composition which has a component that should be a therapeutically effective amount and the specification teaches you what that therapeutically effective amount would be that you should use, you've satisfied the written description that you were envisioned and were in possession of that. This is not a method of treatment, a method of treating all candidates. What does a therapeutically effective do? The claims, not the specs, recite the amount. And they recite the results, which is therapeutically effective. What difference, so you're saying the spec doesn't have to say, the spec would say the exact same thing, I think, if the words therapeutically effective result weren't also a claim limitation. Correct. Right? So it's the exact same spec. So don't you say like, well, since you've added a claim limitation that says therapeutically effective, you need something in the written description to deal with that new limitation? You understand my query. Yes, Your Honor. And our position is that the disclosure and the specification of what an effective amount would be for the composition is the disclosure of the therapeutically effective amount that is claimed and set forth in the policy. Now, were you done until, you haven't gotten to your cross-appeal. No, no, no, that's fine, but did you have anything more on any of the other? No, Your Honor. Okay. On the cross-appeal, given the sake of time, I'll limit. There is a relationship between the two patents, and in this case, our position is the district court finding of non-infringement was based on the erroneous claim construction regarding essentially any, and that the essentially any qualified the NSAID that was surrounded and not any unclaimed NSAID that comprising would permit. And therefore, the district court should not have imposed essentially any limitation on encompassing both the coded NSAID and any unclaimed, uncoded NSAID that was permitted by the comprising litigation. Before you sit down, can I just ask you sort of on the ground what's going on in this case in these patents? So one patent is 2005. The other one is like 2013, way after that, right? I'm just wondering what's going on with, this litigation has been going on for a long time. What's the expiration date? What's the track we're on here for ever reaching closure on this? There are additional patents, suits with additional patents going on at this moment, Your Honor. That involve the same drugs? Yes, in addition to these patents. So the result of this case isn't going to make any difference? No, the results of this case make a huge difference with respect to, there are different parties that were involved in different cases. Some parties are no longer involved in this case than were previously. And did the 235 get backdated to the 907? I'm sorry, did the 907 with the later patent, or the earlier patent? Correct. So what's the priority date for the later patent? Did it get an earlier priority date or is it 2013? I believe the priority dates are the same for both patents. So then 235 claimed priority to the 907? Correct, Your Honor. I mean, that's not even here or there, right? Yeah, if it's the face of the 285 patent, you'll see a claim back to the 907 patent application, and the application that resulted in the 907 patent. Okay, let's move on. Did you want to talk about the uncode on the proxy? Yeah, Judge Lovinger just mentioned if you wanted to cover the second person on the other side. Well, I think the uncode on the proxy issue is similar to the, in the 285 patent is similar to the issue that arises in the 907 patent. Based on our construction of the 907 patent, and essentially any, only limiting the coded inset, that would allow for written description support for what is actually claimed, and that would encompass in the infringement analysis. With regard to that issue, the comprising language means that there is virtually unlimited amount of uncoded inset that is embraced, right? That's her finding. That being so, then the question is, where is there description to cover that embodiment? Well, Your Honor, There is nothing, right? There is no written description for an unlimited amount, just as there's no description for arsenic as discussed earlier, or concrete, or anything else that could be encompassed by a comprising term. Rather, what's disclosed is the composition of the coded inset, and the uncoded PPI. That is all described in the specification. And that, there is written description support for all of that. Right. Assuming you're not adding arsenic, which you're adding just a dab will do, you're adding a little bit of uncoded inset. And the district court noted, even focusing on something the defendants had said, that coordinated release was preferred embodiment. So it may be less preferred to have some decroxing thrust. Well, that's their thrust, or their appeal, as I understand it, is to get me to believe that the district court was wrong in saying that coordinated release was a preferred embodiment. I'm supposed to say it was the only embodiment. That's, as I understand their brief. That is their position. And I understand your brief to say, oh, no, no, no, no, that's not true. It's just a preferred embodiment. But without anybody telling me how I decide the question. How do I know whether or not a reasonable amount of uncoded decroxing is committed? How do I know? The title of the patent is coordinated release. The entire description everywhere is coordinated release. And by coordinated release, they mean acid comes before the necroxyl, right? Well, and the district court pointed out in its decision at page 20 of appendix 39, that the 285 patent sexification preferably provides for coordinated release. And, yes, there was a lot of... She's the one that created the preferred embodiment in the face of a claim that says, we're after coordinated release, and coordinated release, and only coordinated release. And the way you get it is by releasing the acid first. It's not coordinated release, right, if you release the NSAID first, right? Well, as long as the claimed effective amount of NSAID is released second, you have coordinated release. I'm talking about coordinated release, just the concept of coordinated release. The coordinated release of the claimed components. The coordinated release of the coded NSAID and the uncoded PPI. That would be coordinated release. Right, but that's coordinated release of the uncoded necroxyl. The patent doesn't speak to terms of... Pardon me, coded. If you're releasing coded necroxyl first, I don't see how that could... No, the coordinated release is the uncoded PPI releases first, followed by the coded necroxyl. Right. And the patent doesn't speak, and it does not speak to uncoded, other than, as the district court noted at column four, talking about the dosage form preferably providing for coordinated release in a way that elevates the pH. So the patent is silent as to what is encompassed by comprising beyond what the inventor disclosed as his invention, which was the coordinated release of uncoded PPI and coded NSAID. Okay, across the field. Thank you. We'll restore the two minutes and the three minutes, so it's up to you what order you want to go into. Thank you. Very quickly, I just wanted to address first a few points regarding the cross-appeal. That's the 907 patent and essentially any claim construction. First of all, I don't think comprising in that claim gives Verizon license to make the whole tablet into just the core. The reason for that is we all should agree that the use of comprising does not abrogate other claim limitations that are there. And for the 907 patent claims, unlike the 285 patent claims, coordinated release is a defined term. It's another limitation in the claim. And I think that, as I said before, if you were to release a large amount of NSAID or naproxen, first, you are going to undermine the whole point of coordinated release. That cannot be tolerated, but that would be the result of the claim construction that they are suggesting this court adopt. There are at least half a dozen claim construction rules that would be violated by that claim construction. And at the very beginning, it should be clear to everyone that any NSAID does not mean said NSAID. You should need to look only to the words of the claim itself. That answers all the questions we have here. But there are at least five other claim construction rules that would be violated, and they're all discussed in the briefing, and I don't think I need to go through that now. But I did want to point out two other issues. I recognize that the district court in this issue pertains to both the 285 written description arrangement and the 907 cross-appeal. It is certainly correct that the district court characterized the specifications in both the same as silent as to whether it could have uncoated naproxen or whether basically some amount of naproxen can release from somewhere other than the court. I don't agree with that. I think that certainly all the embodiments are confined to coded NSAID, but there is reference in the specification, I think at column three, about the prior type of release which was not coordinated and is characterized as being toxic three times. Indeed, the only safe manner the patent discloses is the inventive manner of release, which is coordinated release. So I do think that counsels. It's more than just being silent. To characterize the alternative as being toxic, to my mind, suggests a clear indication to the person not to do that. Thank you. Thank you, Your Honor. I just wanted to respond to a couple of very quick points. Can you deal with the theory that is now advanced to us as to why the written description teaches us that the uncoated EPI is therapeutically effective? Namely column two. Columns two and column three. Sure. I didn't understand. Maybe I'm wrong. I understand Mr. Monroe to rely on the language in column three as heavily as it's laid out in one slide. I don't recall the district court. What he's talking about is actively raising the energetic pH. Right. So the language in column three is not specific to PPIs at all. It's talking about acid inhibitors as a general category. Nothing in there talks about PPIs doing anything. And as Your Honor may recall, this specification talks about two broad categories of acid inhibitors. Well, it says the method involves a single coordinate that combines an agent that actively raises P and then the agent that's in the patent is uncoated PPI. Well, the patent also talks about using uncoated H2 blockers. That's the other category of acid inhibitors that are discussed throughout the patent and actually referred to as preferred. Is your response to this column three language, well, they're not talking about PPI? Yeah. In a nutshell, yeah. This is a generic language. The PPI, the agent that they claim? They've claimed PPIs and H2 blockers in the claims. Well, why isn't that sufficient? It says the product, the method involves the administration of a single coordinated unit known as product that combines an agent that actively raises energetic pH to levels associated with less risk. So again, this language that we're talking about here is not specific to PPIs. And the district court has looked at the entire specification and made a finding that the specification here, including this language and the specification. Why don't you just lay aside the fact finding from the district court that she said she couldn't find in this fact that dealt with therapeutically effectiveness of uncoated PPI, right? Of uncoated acid-reducing agents. And so why isn't this language helpful to the industry? Well, the claims that we're talking about, the claims that are issued are about effective use of uncoated PPIs, not uncoated acid inhibitors, as are talked about generically. Yeah, PPI and acid inhibitor? It is an acid inhibitor. So why isn't that included? Well, this could just as easily be read to be discussing the H2 blockers that are referred to as preferred. If you look at column 5, around line 44, 45, it says H2 blockers are the most preferred. And those didn't have the same baggage that the PPI inhibitors, that the PPIs have, because those are not acid sensitive. So an uncoated H2 blocker would be known to be functional, even if uncoated, because it's not sensitive to acid. And again, the district court made a finding based on the specification that there is no information about those. I assume that this language had actually referred to PPI, uncoated PPI. And it does, in fact. It says that they can also be used in the next sentence, or the second sentence. Either short or long-term acid inhibitors can effectively be used in the dosage forms. Well, again, they can also be used. Well, again, there's no reference to PPIs specifically here. This is generic language talking about generic claims. Is PPI a long-acting acid inhibitor? It is one, yeah. It's longer acting than the H2. But it might be a different question if this language supported a generic claim or a claim to H2 blockers. This language is not about PPI inhibitors. And again, the district court. Well, how do you know it's not? Well, at most, this may be a factual question. And the district court has resolved that. So I don't think it's been argued that that was. Let me ask you this question. Assuming that the language in column three to which we've been pointed, I guess for the first time today, and the district court missed it, if that expressly had cited the PPI. That, I mean, that may have been. That would have been a factual question for the district court. That's not the case we have here. But it's possible that a district court could think that was enough. But that's not what it says in this case. And that's not the finding we have from the district court. Thank you. Thank you, Your Honor. It was very, as Mr. Monroe, there's very little said about the cross-appeal. But do you want to take a minute to respond or not? No, Your Honor. Thank you. We thank both sides for cases similar to this one. Please excuse me. All rise. Thank you.